**REESE RICHMAN LLP**
Michael R. Reese
mreese@reeserichman.com
Kim E. Richman
krichman@reeserichman.com
Belinda L. Williams
bwilliams@reeserichman.com
875 Avenue of the Americas, 18th Floor
New York, New York  10001
Telephone: (212) 643-0500
Facsimile: (212) 253-4272

- and -

**MILBERG LLP**
Sanford P. Dumain
sdumain@milberg.com
Peter E. Seidman
pseidman@milberg.com
Joshua E. Keller
jkeller@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

*Counsel for Plaintiffs*



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JESSICA FINK and BRETT NOIA, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> TIME WARNER CABLE, <br><br> Defendant. | Case No. 08-Civ.-9628(LTS)(KNF) <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## BASIS OF ALLEGATIONS

Plaintiffs Jessica Fink and Brett Noia ("Plaintiffs") allege the following based on personal knowledge as to themselves and the investigation of counsel which included the review of publicly available information concerning Time Warner Cable ("Time Warner" or "Defendant") and its high-speed Internet service.   Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.      This is a class action on behalf of Plaintiffs and all other similarly situated subscribers to the "Road Runner High Speed Online" Internet service ("Road Runner") against Defendant for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (a)(5)(A) - (B) (the "CFAA"); New York and California consumer protection statutes; Common Law Fraud; Breach of Implied Covenant of Good Faith and Fair Dealing; and Unjust Enrichment.  Plaintiffs seek compensation for the damages caused by Defendant's illegal acts and declaratory relief. Plaintiff Fink also seeks injunctive relief.

2.      Time Warner's "Road Runner" Internet service is named after the Road Runner cartoon character best known for its lightning speed.  Defendant promises that its Road Runner High Speed Online service, as the name itself suggests, provides an "always-on connection" that is  "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up" at a "blazing speed" that provides the "fastest, easiest way to get online."[1]

---

[1] *See* http://www.roadrunneroffers.com/16/?cid=56460&affid=1919913137%3A%3Aexact_time+warner&;http://www.timewarnercablespecial.com/internet.html?PID=google:road_runner (last visited November 7, 2008).

3.      Defendant, however, does not in fact provide a high-speed Internet service that provides an "always-on connection" that is "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up." On the contrary, Defendant "throttles" its subscribers' Internet access and engages in other practices to delay and block certain Road Runner Internet communications, thereby improperly preventing the free flow of online information otherwise accessible to subscribers.

4.      Vuze, a company that makes peer-to-peer software and uses the platform to distribute content, published a study in April 2008, in which it concluded that Time Warner Cable and other Internet broadband providers disrupt peer-to-peer traffic. Vuze asserted that these ISPs regularly send "false reset" messages to the Vuze software with the aim of slowing file transfers.

5.      On May 13, 2008, *PCWorld* had this to say about Time Warner, Road Runner and Internet throttling:

> A Road Runner customer and BitTorrent user from Bar Harbor, Maine is a good example. This user (who asked that his name not be used for fear that his ISP would treat him unfairly) called Road Runner's tech support when his BitTorrent download speeds dropped to a sluggish 8 kilobits per second. When he asked what was going on, a support rep reprimanded him for using BitTorrent software and accused him of downloading copyright-protected music. At the same time, the tech said he couldn't comment on bandwidth management issues.
>
> "I was baffled by the entire exchange," the Road Runner customer said, noting that he was not trying to download copyright-protected content. "I pay a monthly fee for Internet access. I shouldn't be limited to watching YouTube videos, browsing the Web, and checking my e-mail." (Road Runner's parent company, Time Warner Cable, says that it does not block peer-to-peer traffic to BitTorrent, but that it does manage its network in ways that would keep BitTorrent traffic in check.)[2]

---

[2] http://www.pcworld.com/article/145786-2/elude_your_isps_bittorrent_blockade.html (last visited August 3, 2009).

6.      In the July 2008 issue of *PCWorld* magazine, Time Warner Cable spokesperson Alex Dudley admitted that Time Warner engages in  the type of practices discussed above, including limiting bandwidth available to subscribers for peer-to-peer transfers.

7.      Among other reasons, Defendant throttles Internet traffic and otherwise caps bandwidth to prevent or impede subscriber access to information free on the Internet that Defendant also provides as part of an additional service that costs more money.  As of August 2008, the price for this additional service was $9.95 a month, which is in addition to the amount subscribers pay for Defendant's purportedly "always-on connection."  Defendant thus secretly frustrates its subscribers' enjoyment of Defendant's own service for the purpose of inducing subscribers to purchase more expensive services that would be unnecessary were it not for Defendant's misconduct.  Defendant also is motivated to throttle consumers' use of the Internet in order to cram as many subscribers onto its network as it can possibly sign up in order to make as much profit for itself as possible.  Moreover, Defendant is motivated to throttle consumers' Internet service to avoid reducing its profits through expenditures of investments in upgrades to its infrastructure.

8.      This practice has been widely criticized and the Federal Communications Commission ("FCC") has sanctioned one of Time Warner's competitors - Comcast Corporation - for the same type of illegal throttling practice alleged here when it issued a cease-and-desist order against Comcast.  In the memorandum opinion and order released on August 20, 2008 in connection with its sanction of Comcast, the FCC stated that throttling of peer-to-peer transmissions "does not constitute reasonable network management."  The FCC also found, among other things, that:

> •   sending  RST  packets  to  interrupt  and  terminate  TCP
>     connections... contravenes the established expectations of users

3

and software developers for seamless and transparent communications across the Internet -- this practice, known as RST Injection, "'violate[s] the expectation that the contents of the envelopes are untouched inside and between Autonomous Systems'" and "'potentially disrupt[s] systems and applications that are designed assuming the expected behavior of the Internet.'"

- the practices employed...are ill-tailored to the company's professed goal of combating network congestion. In sum, the record evidence overwhelmingly demonstrates that [the] conduct poses a substantial threat to both the open character and efficient operation of the Internet, and is not reasonable.

9.     Furthermore, the FCC found that "Comcast, for example, has not been fully forthcoming about its own practices in the present proceeding, *and its fellow providers have also been cryptic as to their practices*." (emphasis added).

10.     Providers of search engines applauded the FCC's intervention. Google's Washington, D.C. telecom and media counsel stated, "we believe that such a commission order will provide useful clarity on what types of practices are acceptable under the agency's Internet freedom principles, and help ensure that today's broadband networks remain open platforms to the Internet . . . . *No broadband company. . . should be allowed to employ traffic management practices that harm the interests of consumers, and the Internet itself, by failing to deliver fair access to all of the Net's resources.*"[3]

11.     This class action complaint seeks to end Defendant's unauthorized practices and to recover the fees subscribers paid for services they did not receive and to recover costs incurred by subscribers as a result of the conduct alleged herein.

---

[3] *See* http://www.pcmag.com/article2/0,2817,2325455,00.asp (last visited August 7, 2009) (emphasis added). (emphasis added).

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this class action pursuant to 18 U.S.C. § 1030 and 28 U.S.C. §§ 1331, 1332 and 1367. This Court also has diversity jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 7, 119 Stat. 13 ("CAFA"), because there is at least one diverse Class member and the amount in controversy exceeds $5,000,000 in the aggregate. Defendant is a citizen of New York and Class members are citizens of diverse states, including California, Ohio, Maine and Texas. The amount in controversy exceeds $5,000,000 in the aggregate in that this action alleges that each Class member was overcharged at least $20 per month, for each month of the Class Period, and there are an estimated 9.7 million Class Members. This Court has personal jurisdiction over the Defendant pursuant to 18 U.S.C. §§ 1965(b) and (d) and because Defendant's principal place of business is within this District.

13.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a), 28 U.S.C. § 1391 (b), 15 U.S.C. § 22 and 28 U.S.C. § 1391 because the Defendant is found in this District, does business within this District, and conducts the interstate trade and commerce described below in substantial part within this District.

14.     During all or part of the period in which the events described in this Complaint occurred, the Defendant participated in a scheme to defraud Plaintiffs and other members of the Class.

15.     The activities of Defendant, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## PARTIES

16.     Plaintiff Jessica Fink is a citizen of New York and resides in New York County, New York.  During the Class Period, Ms. Fink subscribed to Defendant's Road Runner High Speed Online service.  Ms. Fink relied upon Defendant's misrepresentations that it would provide Internet service that was "high-speed" with an "always-on connection" that was "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up" in deciding to purchase Defendant's service and pay a $20 premium for that service.  Defendant did not disclose to Ms. Fink that Defendant would interfere with, limit, and block her Internet communications or her attempts to exchange data with others over the network without her permission.  If Defendant had disclosed that its Road Runner High Speed Online service was not consistently "high-speed", and did not, in fact, offer "high speed" internet service  with an "always-on connection" that was "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up", or that Defendant would intentionally interfere with her Internet access, Ms. Fink would have not paid a premium for Defendant's Road Runner High Speed Online service.

17.     Ms. Fink did not have an "always-on connection."   Rather, Ms. Fink encountered that her Internet connection was turned off and blocked altogether when she tried to use network services such as Skype.    Thus, Defendant failed to provide Ms. Fink with an "always-on connection."

18.     Nor did Ms. Fink get high-speed Internet service that was "up to 3 times the speed on most standard DSL packages and up to 100x faster than dial-up".

19.     Speed for standard DSL is 1.5 megabytes per second ("Mbps") for download and 384 kilobytes per second ("Kbps") for upload.  Standard dial-up speed is 52.2 Kbps (download ) and 53 Kbps (upload).

20. For Time Warner to deliver "3 times the speed on most standard DSL packages", Defendant would have to provide 4.5 Mbps for download and 1,152 Kbps. For Time Warner to deliver "100x" times the speed of dial-up, Defendant would have to provide 5,220 Kbps for download and 5,300 Kbps for upload.

21. The minimum speed for the Skype calls Ms. Fink was attempting to make through Time Warner's service was a speed of 30 Kbps for download and 30 Kbps for upload.

22. Because Defendant blocked her Skype calls altogether as described immediately above, Ms. Fink did not even get close to "3 times the speed of on most standard DSL packages" or service that was "up to 100x faster than dial-up" since she did not even receive a minimal of 30 Kbps (for upload and download) needed for a Skype call but instead received only 0 Kbps (upload and download), which is far less than both standard DSL (1.5 Mbps (download); 384 Kbps (upload)) and standard dial-up speed (52.2 Kbps (download), 53 Kbps (upload)).

23. Plaintiff Brett Noia is a citizen of California and resides in Los Angeles County, California. Mr. Noia relied upon Defendant's misrepresentations that it would provide High Speed Online Internet service with an "always-on connection" that was "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up" in deciding to purchase Defendant's service and pay a premium for that service. During the Class Period, Mr. Noia subscribed to Defendant's Road Runner High Speed Online service. Defendant did not disclose to Mr. Noia that Defendant would interfere with, limit, and block his Internet communications or his attempts to exchange data with others over the network without his permission. If Defendant had disclosed that its Road Runner High Speed Online Internet service was not consistently "high-speed", and did not provide an "always-on connection" that was "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up", or that Defendant would

intentionally interfere with his Internet access, Mr. Noia would have not purchased or paid a premium for Defendant's Road Runner High Speed Online service.

24.      Mr. Noia did not have an "always-on connection." Rather, Mr. Noia encountered that his Internet connection was turned off and blocked altogether when he tried to use network services such as Skype.      Thus, Defendant failed to provide Mr. Noia with an  "always-on connection."

25.      Nor did Mr. Noia get "up to 3 times the speed on most standard DSL packages" or service that was "up to 100x faster than dial-up".

26.      Speed for standard DSL is 1.5 Mbps for download and 384 kilobytes per second Kbps for upload.  Standard dial-up speed is 52.2 Kbps (download ) and 53 Kbps (upload).

27.      For Time Warner to deliver "3 times the speed on most standard DSL packages", Defendant would have to provide 4.5 Mbps for download and 1,152 Kbps for upload.  For Time Warner to deliver "100x" times the speed of dial-up, Defendant would have to provide 5,220 Kbps for download and 5,300 Kbps for upload.

28.      The minimum speed for the Skype calls Mr. Noia was attempting to make through Time Warner's service was a download speed of 30 Kbps and an upload speed of 30 Kbps.

29.      Because Defendant blocked his Skype calls altogether as described immediately above, Mr. Noia did not even get close to "3 times the speed of on most standard DSL packages" or service that was "up to 100x faster than dial-up" since he did not even receive a minimal of 30 Kbps (for upload or download) needed for the Skype call but instead received only 0 Kbps (upload and download), which is far less than both standard DSL at 1.5 Mbps (download); 384 Kbps (upload) and  standard dial-up speed at  52.2 Kbps (download), 53 Kbps (upload).

30.     Likewise, Mr. Noia used a variety of programs and protocols, including BitTorrent, FTP and HTTP.  He consistently found that uploads from his Time Warner Internet connection would drop to extremely low speeds when using these programs and protocols – usually he could not upload faster than 10 Kbps, and never faster than 30 Kbps.  This is considerably slower than standard DSL (384 Kbps for upload) and standard dial-up speed (53 Kbps for upload).

31.     Defendant Time Warner Cable is headquartered at One Time Warner Center, New York, New York 10019.   Time Warner Cable is one of the world's largest media and entertainment conglomerates.  Its businesses include interactive services, cable systems, filmed entertainment, television networks and publishing.  In September 1999, Defendant announced the launch of the Road Runner High Speed Online Internet service.  Defendant provides Road Runner High Speed Online Internet service to subscribers in most states across the country, including New York, Texas, Maine, Ohio and California.

## SUBSTANTIVE ALLEGATIONS

32.     Defendant offers broadband Internet service to millions of consumers in the United States.

33.     Defendant has promised its Internet subscribers an "always-on connection" at "blazing speed" that is the "fastest, easiest way to get online" and has advertised, marketed and sold its high-speed Internet service based on claims that "Road Runner Honors Your Need for Speed; You'll Never Get Road Rage with Road Runner".[4]  Further, Defendant has claimed it would provide premium service as compared to its competitors in its online promotional

---

[4] *See* http://www.buytimewarnercable.com/internet.aspx?cpao=111&kw=road
%20runner&cpca=tw_cable& cpag=tw_roadr&gclid=CJHc69O8pZYCFQOaFQodLzd_7Q.
(last visited November 7, 2008).

materials, stating, "up to 3 times the speed of most standard DSL packages and up to 100x faster than dial-up so your family can spend their time on the computer learning, experiencing, and playing – instead of waiting."[5]

34.     These representations have allowed Defendant to charge consumers a premium of up to more than 100% of the fees charged by its competitors.[6]

35.     Such representations, however, are all contrary to Defendant's hidden practice of severely limiting the speed of certain Internet communications, which, depending on the particular algorithms and settings the Defendant secretly employs, affect and discriminate against protocols such as BitTorrent peer-to-peer file-sharing communications (used by programs such as Vuze, Miro and World of Warcraft), Gnutella (used by programs such as Limewire and Shareaza), Skype, and other protocols or applications by which audio, video, voice and other data content is communicated online.  Defendant has thus broken its promise of high-speed Internet service as well as other false promises discussed above.  Moreover, such representations are contrary to Defendant's hidden practice of blocking or turning off the Internet connection for particular uses of the network, such as Skype.

## Methods of Interference with "Always-On Connection" Internet Access by Forging Traffic

36.     Computers often exchange information on the Internet by using a standard protocol called Transmission Control Protocol ("TCP").  TCP is designed to provide reliable, ordered delivery of a stream of bytes from one program on one computer to another program on

---

[5] See "Faster Than DSL and Dial Up" tab at
http://www.roadrunneroffers.com/16/?cid=56460&affid=1919913137%3Aexact_time+warner&_ck=1&.  (last visited November 7, 2008).

[6] Compare: http://www.roadrunneroffers.com/16/?cid-56460&affid=1919913137%3A%3Aexact_time+warner & (offering Time Warner Internet service for $29.95 a month) (last visited November 7, 2008) with http://www.earthlink.net/ (offering Earthlink Internet service for $9.95 a month) (last visited November 7, 2008).

another computer. Wikipedia, the online encyclopedia, explained TCP, in relevant part, as follows:

> The Transmission Control Protocol (TCP) is one of the core protocols of the Internet Protocol Suite. TCP is one of the two original components of the suite (the other being Internet Protocol, or IP), so the entire suite is often referred to as "*TCP/IP*." Whereas IP handles lower-level transmissions from computer to computer as a message makes its way across the Internet, TCP operates at a higher level, concerned only with the two end systems, for example a Web browser and a Web server. In particular, TCP provides reliable, ordered delivery of a stream of bytes from a program on one computer to another program on another computer. Besides the Web, other common applications of TCP include e-mail and file transfer. Among its other management tasks, TCP controls message size, the rate at which messages are exchanged, and network traffic congestion.

37.     TCP is commonly used in peer-to-peer (or P2P) transmissions. P2P transmissions use diverse connectivity between participants in a network and the cumulative bandwidth of network participants rather than conventional centralized resources. Such networks are useful for many purposes. For example, this P2P networking technology is used to share content files containing audio, video, data or anything else in digital format as well as real-time data such as telephony traffic (telephone calls made over the Internet). BitTorrent, which also relies on P2P transmissions, is used to quickly assemble large files for transfer and download by tapping into dozens, or even hundreds, of other participating computers. Numerous companies use BitTorrent as a legitimate protocol for exchanging data. Vuze, for instance, uses BitTorrent to distribute downloads from a huge library of licensed content.[7]

38.     One method of throttling and discriminating against particular programs that layer their communications over TCP is to forge TCP packets of a certain type, known as "reset" or "RST" packets. This type of throttling works as follows: two hypothetical Internet users, say

---

[7] http://www.vuze.com/content/BucketBrowse.html (last visited August 7, 2009).

Alice and Bob, are exchanging data over the BitTorrent protocol; the ISP examines the communication, determines that it is BitTorrent, and sends Alice's computer an RST packet, but falsely uses Bob's IP address as the source or "sender" address. Alice's computer is tricked by the forged source address, believes the message came from Bob's computer, and as a result, closes the TCP communication with Bob. Simultaneously, the ISP may send a forged RST packet to Bob, which appears to have come from Alice.

39.     Other forms of throttling include deliberately dropping (failing to deliver) a larger proportion of P2P packets than of non-P2P packets, thereby causing the communications to slow, or blocking a proportion of a P2P program's attempts to establish connections by never transmitting them in the first place.

40.     Defendant uses this type of stealth technology to frustrate its subscribers' efforts to share online content via P2P networks by adversely impacting consumers' P2P programs' connections. The end result is that computers will fail to communicate efficiently as a result of Defendant's secret intervention.

41.     Types of information whose availability are impeded by throttling include: information about other computers around the planet participating in a P2P network; information about the query terms and results of searches across P2P network (in the case of networks such as Gnutella and ED2K); data contents of files which subscribers were attempting to upload or download; and data encapsulating the content of text and voice communications (in the case of P2P VOIP services such as Skype).

42.     Defendant's misrepresentations, acts of concealment, failures to disclose and breaches of its agreement with its subscribers are knowing and intentional, and made for the purpose of deceiving Plaintiffs and the members of the Class to maximize Defendant's gain.

Indeed, Defendant is doubly enriched by these practices: First, Defendant lures Internet users into Road Runner Internet service subscriptions at a premium price by advertising that it has qualities that it in fact lacks. Second, Defendant steers subscribers toward its own more expensive Internet services and digital cable content by blocking similar content otherwise accessible free of charge.

43. Plaintiffs have been damaged and have incurred losses as a result of Defendant's conduct.

44. Mr. Noia relied on his Road Runner High Speed Online Internet connection for numerous purposes, including uploading very large image and vector files in the course of his work as a freelance designer, downloading files, and watching licensed media files. Mr. Noia used a variety of programs and protocols for these purposes, including BitTorrent, FTP and HTTP. He consistently found that uploads from his Internet connection would drop to extremely low speeds – usually he could not upload faster than 10Kbps, and never faster than 30Kbps when he should have been able to upload at up to 300 Kbps. This is considerably slower than standard DSL at 384 Kbps for upload and standard dial-up speed at 53 Kbps for upload.

45. As a result, Mr. Noia was regularly forced to travel to a Kinkos outlet and pay out of pocket costs to rent a computer terminal at Kinkos to perform the large file uploads he needed to make in the course of his freelance design work. In addition to the value of his time lost driving to Kinkos to make uploads that should have been possible with the advertised service he purchased from the Defendant, Mr. Noia's ability to respond quickly to client requests and meet professional deadlines suffered. As a consequence, Mr. Noia lost work opportunities. Mr. Noia estimates that these losses for a single year period during the Class Period to be between $5,500 and $7,000.

46. Mr. Noia did not have a choice of any competing broadband cable or DSL providers, so he took steps of attempting to use a subscription to Verizon's EVDO cellular data service in the hope that it would offer a workable alternative. Long distance EVDO radio connections are by their nature much slower than cable links of the Defendant, yet Mr. Noia paid $59.99 per month in the vain hope that this slower cell phone technology would give him an alternative to Time Warner's poorly performing network.

47. Both Ms. Fink and Mr. Noia used Skype. Skype is a software application that allows users to make free voice calls over the Internet to other Skype users via an encrypted P2P protocol. Ms. Fink and Mr. Noia were unable to receive and make Skype calls they would have been able to receive and make were it not for the Defendant's throttling practice that turned off their purportedly "always-on connection", and thereby compromised the integrity of their computer systems. Furthermore, the availability of data to Ms. Fink and Mr. Noia was impaired because their computers were unable to send and/or receive call request and audio signal information from other Skype users. When this occurred, Ms. Fink and Mr. Noia would not have an "always-on connection" because the particular software they were using was not available online. Nor did they receive service up to "3 times the speed of on most standard DSL packages" or service that was "up to 100x faster than dial-up" since they did not even receive a minimal of 30 Kbps (for upload and download) required for a Skype call, but instead received only 0 Kbps (upload and download), which is far less than both standard DSL at 1.5 Mbps (download); 384 Kbps (upload) and standard dial-up speed at 52.2 Kbps (download), 53 Kbps (upload).

48. Ms. Fink and Mr. Noia suffered a loss as a result of the Defendant's throttling because they each wasted time and effort determining what was causing the slow connection, either by rebooting their computers or by making repeated but unsuccessful attempts to reconnect to various persons using the Skype application. Furthermore, Ms. Fink and Mr. Noia resorted to land line and cell phones to call persons they failed to reach on Skype and thereby incurred costs for telephone service that would not have been incurred were it not for Defendant having interrupted their Skype service.

49. It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits it receives from its subscribers because to obtain that benefit, Defendant promised but did not provide unfettered "always-on" high-speed access to the Internet.

## CLASS ALLEGATIONS

50. Plaintiffs and Class members incorporate and reallege the above paragraphs.

51. Plaintiffs sue on their own behalf and on behalf of a nationwide Class of persons, under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, defined as all persons who, from November 7, 2003 to the date of Class certification, subscribed to Defendant's Road Runner High Speed Online service. As to Rule 23(b)(2), Plaintiff Fink, on her own behalf and on behalf of the Class, seeks injunctive relief for current subscribers of Defendant's Road Runner High Speed service and declaratory relief. As to Rule 23(b)(2), Plaintiff Noia, on his own behalf and on behalf of the Class, seeks declaratory relief.

52. Plaintiff Fink also sues on behalf of a subclass of New York residents who subscribed to Time Warner's Road Runner High Speed Online service during the Class Period for the claims below that apply only to New York residents ("New York Subclass"). Plaintiff Noia also sues on behalf of a subclass of California residents who subscribed to Time Warner's

15

Road Runner High Speed Online service during the Class Period for the claims below that apply only to California residents ("California Subclass").

53. Plaintiffs do not know the exact size of the proposed Class or the identities of the proposed Class members, since such information is in the exclusive control of Defendant. However, according to Defendant's recent filing with the Securities Exchange Commission, "[a]s of June 30, 2011, Time Warner Cable had approximately…9.7 million residential services high-speed data subscribers." Based on this statement, among other things, Plaintiffs believe that the Class encompasses tens of thousands, and indeed, possibly millions, of individuals who are geographically dispersed throughout the United States. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

54. All members of the Class have been subjected to and affected by the same practices and policies described herein. There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to, the following:

- The nature, scope and operations of Defendant's wrongful practices;

- Whether Defendant intentionally accesses its subscribers' computers;

- Whether Defendant's practices breach its implied contract with its subscribers;

- Whether Defendant's practices breach its implied covenant of good faith and fair dealing with its subscribers;

- Whether Defendant engages in fraud, deceit and misrepresentation;

- Whether Defendant is unjustly enriched;

- Whether the Court can award declaratory and injunctive relief; and

- The proper measure of damages.

55.     Plaintiffs' claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class because both the Plaintiffs and the other members of the Class are subjected or have been subjected to the same wrongful practices of Defendant.

56.     Plaintiffs will fairly and adequately represent the interests of the Class. They are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in Class actions.

57.     The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members of the Class who are not parties to the action, or could substantially impair or impede their ability to protect their interests.

58.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same essential facts, proof and legal theories, would also create and allow to exist inconsistent and incompatible rights within the Class.

59.     The Defendant acts, acted or refuses to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

60.     The questions of law and fact common to members of the Class predominate over any questions affecting only individual members.

61.     A Class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

17

- Individual claims by the Class members are impractical as the costs of pursuit far exceed what any one individual Plaintiff or Class member has at stake;

- As a result, individual members of the Class have no interest in prosecuting and controlling separate actions;

- It is desirable to concentrate litigation of the claims herein in this forum; and

- The proposed Class action is manageable.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF COMPUTER
### FRAUD & ABUSE ACT 18 U.S.C. § 1030(a)(5)(A)

62.     Plaintiffs and the Class members incorporate and reallege the above paragraphs as if fully set forth herein.

63.     This claim for relief arises under sections 1030(g) and 1030(a)(5)(A) of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g) and U.S.C. § 1030 (a)(5)(A).

64.     Plaintiffs' and the Class members' computers are "protected computers" within the meaning of the CFAA because they are used in and affect interstate commerce and communication.

65.     Defendant knowingly caused the transmission of a program, information, code, or command to Plaintiffs' and the Class members' computers and thereby intentionally caused damage to Plaintiffs' and the Class members' computers.  Specifically, Defendant knowingly transmitted reset packets to Plaintiffs' and Class members' computers with the intention of impeding or preventing Plaintiffs' and Class members' peer-to-peer transmissions.

66.     The reset packets that Defendant sent damaged Plaintiffs' computers by compromising the internal software of Plaintiffs' computers and impairing their ability to receive and transmit data.

67.     Plaintiffs and the Class members did not authorize Defendant to cause such damage.

68.     Additionally, Plaintiffs and the Class members have suffered loss as a result of Defendants' conduct, the aggregate amount of which is at least $5,000 for a 1-year period during the Class Period.     Aggregation of loss is appropriate because typically, a single act of interference impacts a class of subscribers.

69.     Such loss includes, but is not limited to, the aggregate payment by Plaintiffs and Class members for high-speed Internet services that were not received due to Defendant's improper practices, the aggregate costs incurred by Plaintiffs and Class members to prevent the effects of Defendant's throttling, and the aggregate costs incurred by Plaintiffs and Class members to obtain information elsewhere once it became apparent that they could not receive it from their computers due to Defendant's throttling.     Such losses also include the aggregate time and effort spent by Class members in assessing the damage done to their data or computer and the aggregate time and effort spent by Class members restoring the data, system or information to its condition prior to Defendant's throttling.

70.     Plaintiffs and the Class are, thus, entitled to economic damages subject to proof at trial.

## COUNT II

### VIOLATION OF COMPUTER
### FRAUD & ABUSE ACT 18 U.S.C. § 1030(a)(5)(B)

71.     Plaintiffs and Class members incorporate and reallege the above paragraphs as if
fully set forth herein.

72.     This claim for relief arises under sections 1030(g) and 1030(a)(5)(B) of the
Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(g) and 18 U.S.C. § 1030(a)(5)(B).

73.     Plaintiffs' and the Class members' computers are "protected computers" within
the meaning of the CFAA because they are used in and affect interstate commerce and
communication.

74.     Defendant intentionally accessed Plaintiffs' and the Class members' computers
and as a result of such conduct recklessly caused damage.  Specifically, Defendant intentionally
accessed Plaintiffs' computers by knowingly transmitting  "reset" packets to Plaintiffs' and the
Class members' computers and otherwise accessed their computers to impede data receipt and
transmission, and thereby recklessly caused damage by compromising the internal software of
Plaintiffs' and the Class members' computers and impairing their ability to receive and transmit
data.

75.     Plaintiffs and the Class members did not authorize Defendant to cause such
damage.

76.     Additionally, Plaintiffs and the Class members have suffered loss as a result of
Defendant's conduct, the aggregate amount of which is at least $5,000 for a 1-year period during
the Class Period.   Aggregation of loss is appropriate because typically, a single act of
interference impacts a class of subscribers.

77.     Such loss includes, but is not limited to, the aggregate payment by Plaintiffs and Class members for high-speed Internet services that were not received due to Defendant's improper practices, the aggregate costs incurred by Plaintiffs and Class members to prevent the effects of Defendant's throttling, and the aggregate costs incurred by Plaintiffs and Class members to obtain information elsewhere once it became apparent that they could not receive it from their computers due to Defendant's throttling.  Such losses also include the aggregate time and effort spent by Class members in assessing the damage done to their data or computer and the aggregate time and effort spent by Class members restoring the data, system or information to its condition prior to Defendant's throttling.

78.     Plaintiffs and the Class are, thus, entitled to economic damages subject to proof at trial.

## COUNT III

### DECEPTIVE SALES PRACTICES - N.Y. GEN. BUS. LAW § 349
(ON BEHALF OF THE NEW YORK SUBCLASS)

79.     Plaintiff Fink and the New York Subclass members incorporate and reallege the above paragraphs as if fully set forth herein.

80.     By continuously falsely representing during the Class Period that its high-speed Internet service provides an "always-on connection," that was "up to 3 times the speed on most standard DSL packages and up to 100x faster than dial-up", when in fact Defendant intentionally interferes with its subscribers' connections to the Internet by delaying and blocking certain communications, Defendant engages material, deceptive, consumer-oriented acts, in the conduct of its business, that injured Plaintiff and all others similarly situated in violation of N.Y. Gen. Bus. Law § 349.

81.     The speed and accessibility of a high-speed Internet service is important to Plaintiff Fink and the New York Subclass, and likely to affect their choices concerning these products and services. Plaintiff Fink and the New York Subclass purchased Defendant's high-speed Internet service at a premium price believing it would provide the speed, accessibility and quality that Defendant promised. Plaintiff Fink and the New York Subclass were injured by Defendant's deceptive acts because they unknowingly paid a premium for a service that intentionally interfered with their connections to the Internet by delaying and blocking certain communications.

82.     As a direct and proximate cause of Defendant's violation of N.Y. Gen. Bus. § 349, Plaintiff Fink and the New York Subclass have been damaged in an amount that will be proven at trial.

83.     Plaintiff Fink and the New York Subclass is therefore entitled to a permanent injunction enjoining Defendant from its deceptive activity and to recovery as provided by New York General Business Law § 349 (h).

## COUNT IV

### BREACH OF IMPLIED IN FACT CONTRACT AND COVENANT OF GOOD FAITH AND FAIR DEALING

84.     Plaintiffs and Class members incorporate and reallege the above paragraphs as if fully set forth herein.

85.     Defendant, through its advertising and marketing of its high-speed Internet service, makes uniform representations and offers regarding the quality of its high-speed Internet service.

86.     Plaintiffs and Class members accepted Defendant's offer based upon Defendant's promises regarding the quality of its high-speed Internet service, including that it would provide

22

an "always on connection" Internet service with "up to 3 times the speed on most standard DSL packages and up to 100x faster than dial-up", and gave consideration to Defendant by paying it monthly fees. Plaintiffs and Class members thus entered into an implied-in-fact contract with Defendant, which was thereby breached by and is breached by Defendant's practice of slowing down and blocking Internet service and Internet communications and otherwise impairing access to the content, services and applications that the Internet has to offer.

87.    Plaintiffs and Class members performed all their obligations under the contracts by paying for their service.

88.    Defendant breaches its implied covenant of good faith and fair dealing by knowingly failing to provide Plaintiffs and Class members with the service they desire, paid consideration for and thought they were receiving.

89.    Plaintiffs and Class members had the legal capacity to enter into the aforementioned implied agreements.

90.    As a direct and proximate result of the breaches set forth herein, Plaintiffs and Class members have suffered, and continue to suffer, damages in an amount which will be proven at trial, but which are in excess of the jurisdictional minimum of this Court.

## COUNT V

### DECEIT FRAUD AND/OR MISREPRESENTATION

91.     Plaintiffs and Class members incorporate and reallege the above paragraphs as if fully set forth herein.

92.     During the Class Period, Defendant engages in fraudulent, misrepresentative, false and/or deceptive practices.

93.     These aforementioned frauds, misrepresentations, deceptive, and/or false acts and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members when signing up for Defendant's high–speed Internet service.

94.     Plaintiffs and Class members would have acted differently had they not been misled, but instead been informed that Defendant did not provide an "always-on connection" that was not "up to 3 times the speed on most standard DSL packages and up to 100x faster than dial-up" as promised.

95.     By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their position to their detriment.

96.     Plaintiffs and Class members justifiably and reasonably relied on Defendant's omissions and misrepresentations, and, as such, were damaged by the Defendant.

97.     As a direct and proximate result of Defendant's omissions and misrepresentations, Plaintiffs and Class members have suffered damages including paying for a high-speed "always-on" Internet service  that was represented to be "up to 3 times the speed on most standard DSL packages" and  "up to 100x faster than dial-up", which, in fact,  they did not receive.

## COUNT VI

### UNJUST ENRICHMENT

98.     Plaintiffs and Class members incorporate and reallege the above paragraphs as if fully set forth herein.

99.     Defendant's deceptive scheme unjustly enriched Defendant, to the detriment of the Class, by causing Defendant to receive payments for a high-speed Internet service with, among other things, an "always-on connection," that it did not provide.

100.    Plaintiffs and Class members have been injured by paying for a high-speed Internet service with, among other things, an "always-on connection," that they did not receive.

101.    Defendant's retention of funds paid by Plaintiffs and Class members violates the fundamental principles of justice, equity, and good conscience.

102.    Defendant, therefore, should be ordered to return any funds obtained as a result of its deceptive scheme to the Class.

103.    As a result of Defendant's deceptive, fraudulent and misleading practices, advertising, marketing and sales of its high-speed Internet service with an "always-on connection," Defendant is enriched at the expense of its subscribers. It is thus against equity and good conscience to permit Defendant to retain the ill-gotten benefits it receives from its subscribers who are promised unfettered, high-speed access to the Internet that has an "always-on connection" that is "up to 3 times the speed on most standard DSL packages…[and] up to 100x faster than dial-up".

## COUNT VII

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *et seq.* (UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES)

104.    Plaintiff Noia and the California Subclass members incorporate and reallege the above paragraphs if fully set forth herein.

105.    Beginning at an exact date unknown to Plaintiff Noia, but within the Class Period, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unfair, unlawful and fraudulent trade practices in California by engaging in the unfair and illegal business practices detailed above.

106.    Defendant knowingly and intentionally misled consumers by continuously and falsely representing during the Class Period the qualities and abilities of its Road Runner High Speed Online service.  In particular, Defendant unlawfully represents it offers an "always-on connection" Internet service at "up to 3 times the speed on most standard DSL packages…[and] up to 100x faster than dial-up" because it engaged in throttling, thereby slowing and blocking and turning off the high-speed Internet service and Internet communications of Plaintiff Noia and all others similarly situated.

107.    Defendant's false and misleading representations constitutes "unfair" business acts and practices because such conduct is immoral, unscrupulous, and offends public policy. Further, the gravity of Defendant's conduct outweighs any conceivable benefit of such conduct.

108.     The business practices alleged above are unlawful under § 17200, *et seq.* by virtue of violating § 17500, *et seq.*, which forbids untrue advertising and misleading advertising. These business practices also are unlawful under the Computer Fraud and Abuse Act as alleged above.  The business practices also are unlawful under the California Consumer Legal Remedies Act as discussed herein.

109.    Defendant's representations regarding the ability of its Road Runner High Speed Online service is important to Plaintiff Noia, and all others similarly situated, and likely to affect their choices in subscribing to Defendant's high-speed Internet service. Plaintiff Noia, and all others similarly situated, were injured by Defendant's unfair, unlawful and/or fraudulent acts because they paid for the monthly subscription, which did not deliver upon the promises represented to consumers. Had Plaintiff Noia and other members of the Class known of the truth about the high-speed Internet service being throttled, they would not have subscribed to the service or paid a premium for said service.

110.    The aforementioned practices that Defendant has used, and continues to use, to its significant gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors, as well as injury to the Class.

111.    Plaintiff Noia seeks, on behalf of those similarly situated, full restitution and disgorgement of monies, as necessary and according to proof, to restore any and all monies acquired by the Defendant from Plaintiff Noia, and those similarly situated, by means of the unfair and/or fraudulent trade practices complained of herein, plus interest thereon.

112.    Plaintiff Noia, and those similarly situated, are further entitled to and do seek a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent. Without a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent, future customers will repeatedly and continuously need to seek legal redress in order to recoup monies paid to the Defendant to which the Defendant is not entitled. Plaintiff Noia, and those similarly situated, have no other adequate remedy at law to ensure future compliance with the Cal. Bus. & Prof. Code alleged to have been violated herein.

113. As a direct and proximate result of such actions, Plaintiff Noia and the other members of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such fraudulent, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

114. As a direct and proximate result of such actions, Defendant enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

115. Therefore, Plaintiff Noia prays for relief as set forth below.

### COUNT VIII

### VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17500, *et seq.* MISLEADING, DECEPTIVE OR UNTRUE ADVERTISING (ON BEHALF OF THE CALIFORNIA CLASS)

116. Plaintiff Noia and the California Subclass members incorporate and reallege the above paragraphs as if fully set forth herein.

117. Plaintiff Noia asserts this cause of action against the Defendant for violations of California Business and Professions Code § 17500, *et seq.* for misleading, deceptive or untrue advertising.

118. At all material times, the Defendant engaged in a scheme of offering its Road Runner High Speed Online service to Plaintiff Noia and other members of the California Subclass by way of, *inter alia*, commercial marketing and advertising, the World Wide Web (Internet), product packaging and labeling, and other promotional materials. These materials misrepresented and/or omitted the truth about the high-speed Internet service being offered. Defendant knew, or in the exercise of reasonable care should have known, that these statements were deceptive, misleading or untrue.

28

119. Said advertisements and inducements were made within the State of California and come within the definition of advertising as contained in California Business and Professions Code § 17500, *et seq.* in that such promotional materials were intended as inducements to subscribe to the high-speed Internet service and are statements disseminated by the Defendant to Plaintiff Noia and the California Subclass and were intended to reach members of the California Subclass. Defendant knew, or in the exercise of reasonable care should have known, that these statements were misleading, deceptive or untrue.

120. In furtherance of said plan and scheme, Defendant has prepared and distributed within the State of California via commercial marketing and advertising, the World Wide Web (Internet), product packaging and labeling, and other promotional materials, statements that misleadingly and deceptively represent the truth about the high-speed Internet service being throttled.

121. Consumers, including Plaintiff Noia, necessarily and reasonably relied on these materials concerning Time Warner customers, including Plaintiff Noia and the California Subclass, who were among the intended targets of such representations.

122. The above acts of the Defendant, in disseminating said misleading and deceptive statements throughout the State of California to consumers, including Plaintiff Noia and members of the California Subclass, were and are likely to deceive reasonable consumers, including Plaintiff Noia and other members of the California Subclass, by obfuscating the truth about the high-speed Internet service being throttled, all in violation of the "misleading prong" of California Business and Professions Code § 17500.

123. As a result of the above violations of California Business and Professions Code § 17500, *et seq.*, Defendant has been unjustly enriched at the expense of Plaintiff Noia and the

other members of the California Subclass. Plaintiff Noia and the California Subclass, pursuant to California Business and Professions Code § 17535, are entitled to any such orders and judgments which may be necessary to disgorge Defendant's ill-gotten gains and restore to any person in interest any money paid for the Time Warner service as a result of the wrongful conduct of the Defendant.

124.    Therefore, Plaintiff Noia prays for relief as set forth below.

## COUNT IX

### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT – CAL. CIV. CODE § 1750, *et seq.* (ON BEHALF OF THE CALIFORNIA CLASS)

125.    Plaintiff Noia and the California Subclass members incorporate and reallege the above paragraphs as if full set forth herein.

126.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* (the "CLRA").

127.    Defendant's actions, representations and conduct has violated, and continues to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

128.    Plaintiff Noia and California Subclass members are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

129.    The Road Runner High Speed Online service that Plaintiff and the California Subclass purchased from Defendant were "services" within the meaning of Cal. Civ. Code § 1761(b).

130.    By engaging in the actions, misrepresentations and misconduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(5) of the CLRA. Specifically, in violation of Cal. Civ. Code § 1770(a)(5), Defendant's acts and practices

30

constitute unfair methods of competition and unfair or fraudulent acts or practices in that it misrepresents that the service has particular uses, benefits or quantities which it does not have.

131. By engaging in the actions, misrepresentations and misconduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(7) of the CLRA. Specifically, in violation of Cal. Civ. Code § 1770(a)(7), Defendant's acts and practices constitute unfair methods of competition and unfair or fraudulent acts or practices in that it misrepresents that the service is of a particular standard, quality or grade.

132. By engaging in the actions, misrepresentations and misconduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, §1770(a)(9) of the CLRA. Specifically, in violation of Cal. Civ. Code § 1770(a)(9), Defendant's acts and practices constitute unfair methods of competition and unfair or fraudulent acts or practices in that it advertises services with intent not to sell them as advertised.

133. By engaging in the actions, misrepresentations and misconduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, §1770(a)(16) of the CLRA. Specifically, in violation of Cal. Civ. Code §1770(a)(16), Defendant's acts and practices constitute unfair methods of competition and unfair or fraudulent acts or practices in that it represents that the subject of a transaction has been supplied in accordance with a previous representation when it has not.

134. Pursuant to § 1782 of the CLRA, by letter dated September 10, 2009, Plaintiffs notified Defendant of Defendant's particular violations of § 1770 of the CLRA, which notice demanded that Defendant rectify the problems associated with the action detailed above and give notice to all affected consumers of its intent to so act. Defendant waived its right to receive this letter directly via certified mail.

135. Defendant has failed to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the CLRA. Therefore, Plaintiff Noia seeks actual, punitive and statutory damages, as appropriate.

136. Therefore, Plaintiff Noia prays for relief as set forth below.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs pray for judgment as follows:

- Certification of the Classes, certifying Plaintiffs Fink and Noia as representatives of the Class, and designating their counsel as counsel for the Class;

- Certification of the California Subclass, certifying Plaintiff Noia as the representative of the California Subclass, and designating his counsel as counsel for the California Subclass;

- Certification of the New York Subclass, certifying Plaintiff Fink as the representative of the New York Subclass, and designating her counsel as counsel for the New York Subclass;

- Declaration that Defendant has committed the violations alleged herein;

- For restitution and disgorgement pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.* on behalf of the California Subclass;

- For declaratory relief pursuant to, without limitation, the California Business & Professions Code §§ 17200, *et seq.* and 17500, *et seq.* on behalf of the California Subclass;

- For declaratory relief and monetary damages on behalf of the California Subclass;

32

- For declaratory and injunctive relief pursuant to N.Y. Gen. Bus. § 349 on behalf of the New York Subclass;

- For monetary damages pursuant to N.Y. Gen. Bus. § 349 on behalf of the New York Subclass;

- For any other injunctive relief, as to Plaintiff Fink, as permitted by law or equity;

- An award of compensatory damages, the amount of which is to be determined at trial;

- For punitive damages;

- For interest at the legal rate on the foregoing sums;

- For costs of suit incurred; and

- For such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

DATED:  September 30, 2011

Respectfully submitted,

**REESE RICHMAN LLP**

By: _Michael R. Reese_
Michael R. Reese
Kim E. Richman
Belinda L. Williams
875 Avenue of the Americas. 18th Floor
New York, New York  10001
Telephone:  (212) 643-0500
Facsimile:  (212) 253-4272

**MILBERG LLP**
Sanford P. Dumain
Peter E. Seidman
Joshua E. Keller
One Pennsylvania Plaza, 49th Floor
NewYork, New York 10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

*Counsel for Plaintiffs*

34

## **CERTIFICATE OF SERVICE**

I, Michael R. Reese, do hereby certify that on September 30, 2011 I served a copy of Plaintiffs' Second Amended Complaint on counsel of record for Defendant via electronic mail pursuant to agreement between the parties.

Dated:  September 30, 2011                          */s/ Michael R. Reese*
                                                                       Michael R. Reese